This litigation presents problems of the priority of several classes of taxes as well as other liens. A subsidiary question, which can be considered separately, concerns the alleged apportionment of municipal liens on a certain parcel of land in the town of Irvington.
Block 284 on the tax map is bounded by Berkeley Terrace, Twenty-third street, Springfield avenue and Grove street. All of it, except a few scattered lots on Grove street, was assessed as lot No. 1. Mrs. Elizabeth Ollemar, who owned this land as well as much other property in the neighborhood, died January 29th, 1931, devising the plot at the corner of Springfield avenue and Grove street to her daughter, Anna E.K. Ollemar, for life, and the rest of lot No. 1, as well as the remainder interest in the corner plot, to her executors on sundry trusts. *Page 404 
In this situation, on June 26th, 1937, Miss Ollemar and Mr. Frank A. Geiger, as executors, presented to the "Department of Revenue and Finance, Division of Taxes and Assessments of the Town of Irvington" on a printed form supplied by the department, an application that the taxes and assessments on lot No. 1, be apportioned among eleven subdivisions of the lot, as shown on a map which was made part of the application. Mr. McDonough, chief clerk of the division, added an endorsement, also on a printed form, which recited the application and stated:
"Now therefore, the said Department of Revenue and Finance, Division of Taxes and Assessments, by the authority conferred by law, do make the following apportionment and division of the said liens, that is to say: See pages attached for apportionment.
"In witness whereof, we have hereunto set our hands this first day of July, 1937.
 Department of Revenue and Finance, Division of Taxes and Assessments, J.S.T. McDONOUGH, Chief Clerk."
The attached pages, which were prepared by McDonough, show that the municipal liens with interest encumbering lot No. 1, totaled $34,398.50. This sum is apportioned, as shown by the schedule, among the eleven subdivisions, to which are given new lot numbers. The corner lot which is now lot No. 1, is stated to be subject to $1,908.69, plus interest of $343.09, making $2,232.14. The other ten lots, to which are given various numbers, are severally allotted amounts totaling the balance of the lien.
Four weeks later, at a regular meeting of the town commission of Irvington held July 27th, 1937, the following occurred, as shown by the clerk's minutes:
"Mayor Miller called a hearing on the apportionment of the Ollemar Property. The Clerk read the notice of hearing.
Mayor Miller: Is there anyone present who desires to be heard?
Commissioner Kruttschmitt: This has been in the process of work for a long, long while and it is an apportionment on the part of the Estate of Elizabeth Ollemar signed by Anna E. Ollemar and Frank Geiger who are in accord with their desire and it is in accord with ours. I offer this for final consummation.
Commissioner Jacobi: I offer the record of the apportionment of the Ollemar Estate and move it be ratified and confirmed by the Board. *Page 405 
Motion seconded by Commissioner Kruttschmitt and carried by the following votes:
AYE: Commissioners Jacobi, Kruttschmitt, Miller. (3)
NO: None."
When the application was presented to the department of revenue and finance, the applicants paid $4,426.49, which was credited to the corner lot, now lot No. 1 in the apportionment calculation, and still left $2,232.14 unpaid, as I have mentioned. October 8th, 1937, on application of the collector of taxes, he was appointed receiver of rents of "Block 284, Lot 1 (as apportioned)" and other Ollemar parcels, pursuant to P.L. 1933p. 1304. His petition showed due on lot 1, $1,908.69, the same sum, exclusive of interest, stated in the apportionment. Another lot mentioned in his petition, No. 124, had no existence in the tax department before the apportionment.
On July 25th, 1938, the collector reported to the court that he had collected $1,699.10 which he credited on lot No. 1 and — Miss Ollemar, the life tenant, made some payments — and "that all the arrearages of taxes and assessments on said property are now paid in full." He thereupon was discharged as receiver of that lot. His report that all taxes had been paid undoubtedly meant new lot No. 1, the corner plot, and not the old, large lot.
Despite the proceedings which I have recited, the town claims that the tax liens were never apportioned and that the corner lot is still encumbered by liens which accrued prior to July 25th, 1938, as well as subsequent liens.
The statute, R.S. 54:7-1, authorizes the governing body of the municipality to apportion among subdivisions, municipal liens against a parcel of real estate.
R.S. 54:7-4:
"The governing body may make the apportionment by resolution. A copy of the apportionment shall be filed with the Clerk and with the collecting officer of the municipality and the charge as apportioned to each subdivision shall then be a charge or lien thereon in the same manner as if originally so assessed or imposed."
The principal contention of the town is that the apportionment was not made by resolution. The thought behind this *Page 406 
contention seems to be that a resolution must read, "Be it resolved," c., but this is not the law. A body, such as the town commission "must act when assembled at stated or special meetings, and organized with a president to conduct and a clerk to record its proceedings. Such body can hardly act in any other manner than by ordinance or resolution. Every act must be by a vote of the members present, and whether it is called an order, direction or motion, it is still a resolution because it must be resolved on upon a motion made by some member." Dey v. JerseyCity, 19 N.J. Eq. 412. All through our numerous cases dealing with municipal action, it will be seen that a board or body can act only by ordinance or resolution; these are the alternative methods. Any action of the body which does not rise to the dignity of an ordinance, is a resolution. When the board of commissioners of Irvington, after Commissioner Kruttschmitt had presented the Ollemar apportionment "for final consummation," passed Commissioner Jacobi's motion that the record of the apportionment "be ratified and confirmed by the Board," the board took the action required of it by the statute.
There is no direct evidence that a copy of the apportionment was filed either with the clerk or with the tax collector. The papers which were introduced in evidence were produced by the town but it is not shown in what offices they were found, but from the fact that the minutes of the meeting were made by the clerk, and that the apportionment was acted upon by the collector, the inference may be drawn that these provisions of the statute were followed. I need not consider whether such filing is essential to an effective apportionment. The apportionment in this case was made in accordance with the statute and was effective.
The town also points out that the tax collector did not enter the apportionment on the tax duplicate. But the collector's records cannot nullify the apportionment. Again, the town points to a covenant by the Ollemar executors, contained in their application for apportionment whereby they promised to pay "the sums so apportioned and divided so far as the same relate to or affect the property owned by us." They paid only part of the liens, but the breach of covenant does not vitiate the apportionment. *Page 407 
There are three causes before me. The first, filed January 9th, 1934, docket 100/318, is brought by the town of Irvington against Anna E.K. Ollemar and others, prays foreclosure of two tax sale certificates dated November 15th, 1927, covering block 239, lot 1, and block 240, lot 14. The Ollemars answered, attacking the validity of the certificates. Then followed certiorari in the Supreme Court and appeal to the Court of Errors and Appeals.Ollemar v. Irvington, 117 N.J. Law 399. After the certificates were established, the answer was struck and reference made to a master to determine the amount due. He reported October 28th, 1937, that the sum of the liens is $269,022.50, apportioned among several lots into which the two original lots had been divided by the municipality in 1934. Exceptions were filed by the Ollemars and overruled. A day was fixed for redemption and the master reported that one lot had been redeemed by Miss Anna E.K. Ollemar and the rest were unredeemed. The matter has been purposely delayed in the hope that someone might raise the funds necessary to redeem, but now the town moves for a final decree under R.S. 54:5-87, vesting in the town an absolute and indefeasible estate of inheritance in fee-simple. In the third suit, which will be considered below, are alleged grounds on which is sought an injunction against entering the decree.
The second suit, bill filed July 27th, 1937, docket 119/407, is also brought by the town of Irvington against Anna E.K. Ollemar and others, for the foreclosure of tax sale certificates. They all bear date December 15th, 1933, and cover respectively lot 52, block 241; lots 50 and 57 of block 283; and in block 284, lots Nos. 1 (that is, the large lot on which the question of apportionment first mentioned above arose), 1A, 13, 19, 21, 22, 23 and 24. The municipal liens on these lots aggregate $93,799.26.
The defendant Irvington National Bank answered, setting forth a mortgage and a judgment held by it and claiming priority over the tax liens.
The State of New Jersey was joined as a party defendant because it has a lien for transfer inheritance taxes on the estate of Mrs. Ollemar, in the sum of $14,086.15, besides *Page 408 
interest of about $12,000. The state has moved that it be dismissed on the ground that the lien of the inheritance tax is prior to the municipal lien and that the court is without jurisdiction in that the suit is one against the state.
The United States of America is also named as a defendant because it, too, is alleged to claim a lien for an estate tax on the estate of Mrs. Ollemar.
A decree pro confesso has been taken against the United States and all other defendants, save the bank, the state and infants in whose behalf formal answers were filed, and the case has come on for final hearing of the issues between the town, the bank and infants.
The bill in the third suit was filed February 16th, 1940, docket 129/141, by the Irvington National Bank against the town, the United States, the State of New Jersey, the claimants under Mrs. Ollemar's will and sundry tenants who are in possession of parts of the land described in the other two bills. It prays that the court may determine the order and priority of the liens and claims of the bank, United States, the state, the town, and the other parties to the suit; that an account may be taken of the amount due complainant; that the court marshal the assets of the Ollemar estate and require the governmental bodies to resort first to the lands on which complainant has no mortgage or, in the alternative, that the several tax liens be apportioned to the various tracts; also, that the town be restrained until disposition of this suit from the further prosecution of the two tax foreclosure actions. The town and the Ollemar executors move to strike this bill.
Let us first consider the question of priority between the liens of the town and of the state. It is the general rule that priority is determined by the dates as of which the liens attach to the property. First in time, first in rank. Westervelt v.Voorhis, 42 N.J. Eq. 179; 43 N.J. Eq. 642. Majewski v.Greenberg, 101 N.J. Eq. 134. An assessment for a local improvement becomes a lien upon confirmation by the governing body. R.S. 40:56-33. Municipal taxes become liens December 1st of the year in which they fall due. R.S. 54:5-6. A transfer inheritance tax becomes a lien on the property owned by the decedent as of the date of his death. *Page 409 R.S. 54:35-5. Mrs. Elizabeth Ollemar died January 29th, 1931, and as of that day inheritance taxes subsequently levied became a lien on all the property described in the several bills of complaint. Prior to her death, liens for local improvements had fastened to some of the lots, for instance, lot 1A of block 284 described in the second bill, against which an assessment was confirmed May 16th, 1928, on which there was due at the hearing, including interest, $1,031.25. After Mrs. Ollemar's death, other municipal liens attached to the lot, amounting to $8,186.84. Unless the rule has been changed by statute, the municipal lien which arose prior to January 29th, 1931, is the first lien; second is the lien of the state for inheritance tax; and third are the municipal liens which accrued subsequent to death.Morrow v. Dows, 28 N.J. Eq. 459. The tax sale law states that every municipal lien shall be paramount to all prior or subsequent alienations or encumbrances except subsequent municipal liens. R.S. 54:5-9. But these general words do not operate to subordinate a prior lien held by the state. Trusteesof Public Schools v. Trenton, 30 N.J. Eq. 618; affirmed, Id.667, 683. The state's lien for inheritance tax is superior to municipal liens which accrued after the death of Mrs. Ollemar.Berry-Schilling, Inc., v. Shuster, 122 N.J. Eq. 256; Bowes v.United States, 127 N.J. Eq. 132. The order of priority stated above is not affected by R.S. 54:5-9.
The tax sales pleaded in the second bill all took place December 15th, 1935, subsequent to the death of Mrs. Ollemar. Again, for example, lot 1A of block 284, was sold for taxes which became liens after her death, as well as for the local improvement assessment which had been confirmed in her lifetime. The consideration for the sale was the amount due both for the old assessment and for the more recent taxes. Though the sale was after death, the town, as purchaser, acquired the liens to enforce which the sale was made. R.S. 54:5-42. The sale did not disturb the order of priority of the liens.
The statute says that when a certificate of sale is held by the municipality, as in this case, the amount required for redemption shall include all subsequent municipal liens. *Page 410 R.S. 54:5-59. But again the rule should be applied that general words do not bar or affect the right and title of the state. "Where the government is not expressly, or by necessary implication, included, it ought to be clear from the nature of the mischiefs to be reached, or the language used, that the government itself was in contemplation of the legislature, before a court of law would be authorized to put a construction on a statute which would affect its rights." Trustees of PublicSchools v. Trenton, supra (at p. 683). While our law does not appear to contemplate that the state shall redeem from a municipal lien, if it should become necessary to determine what amount the state must pay for redemption, I would say the amount is what is due on the liens which have priority to the claim of the state, and not what is owing the municipality on subsequent liens.
That brings us to the attorney-general's objection that the state is improperly joined as a defendant in the town's foreclosure action. The state, of course, cannot be sued without its consent. The town, to justify the joinder, relies on R.S.2:61-1, which enacts that whenever the state has a lien and a suit arising out of a previous lien is brought, the lien of the state or its priority may be brought in question and definitely settled. But the state points to the last clause in R.S.2:61-4. "The lien of the State, on sale under such judgment or decree, shall be cut off and the claim of the State shall be made out of the surplus, if any, in the order of priority in which the encumbrance of the State stands." From this it is argued that the consent of the state applies only to a suit of such nature that the decree is followed by execution sale which may possibly produce surplus money, and that it does not apply to the strict foreclosure of a municipal lien.
When this statute was first enacted in 1872, all actions to enforce liens (so far as my study of the subject discloses), led to a sale of the encumbered property. Strict foreclosure of mortgages had fallen into disuse half a century earlier, while the strict foreclosure of tax liens did not appear until several decades later. The legislature has made no provision for the protection of the state's lien in a suit to foreclose a *Page 411 
prior municipal lien. No state officer is empowered to pay off the prior lien; no money has been appropriated for that purpose. If the contention of the town is correct, no matter how small in comparison with the value of the property is its prior lien, the state's subsequent lien will be cut off because the legislature, while permitting the state to be joined in the suit, has entirely neglected to protect the state's interest in the suit.
While the language of R.S. 2:61-1 is broad enough to cover the present suit, the clause relating to judgment sale and surplus money should be given the restrictive effect for which the state argues. I conclude that the state is improperly joined, and as to it, the second bill of the town will be dismissed.
The next question goes to the relative priority of the liens of the town and of the United States.
The Federal Internal Revenue Code, U.S.C.A. title 26 §827a, provides that the estate tax due the United States "shall be a lien for ten years upon the gross estate of the decedent, except such part of the gross estate as is used for the payment of charges against the estate and expenses of its administration, allowed by any court having jurisdiction thereof, shall be divested of such lien." In Bowes v. United States, supra, it was held that this lien of the United States had priority over municipal taxes subsequently assessed and, indeed, over the lien of the state for inheritance tax.
The Irvington National Bank is also a lienor. When Mrs. Ollemar died in 1931, she owed the bank $49,219 on promissory notes payable a month after her death. The executors recognized the debt, made some payments on account and on February 20th, 1933, gave to the bank as collateral security a mortgage for $43,500, covering part of the lands described in the two tax foreclosure bills. In 1937, the bank recovered judgment against the Ollemar executors and trustees for $27,139, the amount then owing. Execution issued and was returned wholly unsatisfied.
The bank has a specific mortgage lien on some of the land, subsequent in rank to all the other liens which I have mentioned. But the bank also has a lien arising at the moment of Mrs. Ollemar's demise, which it insists is prior to the liens of the state and the United States. *Page 412 
Our statute, R.S. 3:25-21, directs that the real estate of a decedent shall remain liable for the payment of his debts for one year after his decease. This has been construed to give to the creditor a lien on the land for one year and thereafter until abona fide sale by the heir or devisee. Haston v. Castner,31 N.J. Eq. 697; Crane v. Doherty, 117 N.J. Eq. 14. The bank's judgment gave it no additional lien. FitzRandolph v.FitzRandolph, 121 N.J. Eq. 380. The bank's lien, as a general creditor, did not come into existence earlier than those of the state and the federal government, for they all fastened to the land upon the death of Mrs. Ollemar. From examination of the statutes on which they are based, it is apparent that the general creditor's lien comes after the other two, and it was so held inBowes v. United States, supra.
The bank, however, has a general creditor's lien, and it is enforceable only in Chancery, since more than a year has elapsed since testator's death. Donahue v. Casabianca,112 N.J. Law 158.
The bill of complaint of the bank unquestionably lies for the enforcement of its lien. The only doubt is whether the prior lienors, the town, the state and the nation, are properly joined. As a practical matter, in order to afford the bank any real relief, they must be joined. To illustrate the difficulty, take lot 25 of block 239 and new lot 1 of block 284. They are worth, let us assume, $20,000. They are the only lots free from municipal liens but they are subject in common with all the Ollemar property to the liens of the inheritance and estate taxes, amounting to over $50,000. Obviously, no one would bid in the lots in that situation. However, if these tax liens were apportioned among all the Ollemar properties according to their value, the amount allocated to lot 25 and lot 1 would be, let us say, $2,000. They could be readily sold subject to their proportion of the tax liens and thereby the bank recover some part of what is owing to it. Or if all the Ollemar lots were sold free of the inheritance and estate tax and subsequent liens, the liens to be paid out of the purchase money, the bank might realize something. For there would be an excellent prospect that the total sales price would exceed *Page 413 
the liens of New Jersey and the United States, and some part of the price of lots 25 and 1, which are free of municipal liens, would be applicable to the bank.
In such a situation, the prior lienors may be brought into equity, so that relief may be given to the creditor. The jurisdiction is generally considered under the title of marshalling. Dieckmann v. Walser, 112 N.J. Eq. 47; 114 N.J. Eq. 382; Duncan v. Grafflin, 26 N.J. Eq. 228. The extent and exact character of the bank's relief are problems to be solved on final hearing. Of course, the equity of the bank cannot be used to the prejudice of the prior lienors. The town urges that it will be prejudiced because the bank has delayed until this late day before bringing its suit. But if I am correct in holding, as I have, that the state cannot be joined in the tax sale foreclosure, and that the liens of New Jersey and the United States are paramount to subsequent municipal liens, it follows that the tax sale foreclosures can yield to the town very little benefit and that the town has a better prospect of actually obtaining the amount of its liens in the suit brought by the bank.
The question has not been presented whether the state and the United States have consented to be sued in this action.
The motions to strike the bill will be denied; the further prosecution of the foreclosure suits will be enjoined. Suitable provisions may be inserted in the order for speeding the bank's suit. *Page 414